UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

REBECCA DEMARB,

        Plaintiff,

    v.                                       Case No. 20-cv-778-pp

JEFFREY ISROFF,
and SYMAX, LLC,

        Defendants.

---

**ORDER DENYING WITHOUT PREJUDICE DEFENDANTS' MOTION TO STAY (DKT. NO. 11)**

---

On May 22, 2020, the plaintiff, as receiver of UMS Holdings, LLC, filed a complaint against Jeffrey Isroff (the former CEO of UMS Holdings) and Isroff's holding company, Symax LLC. Dkt. No. 1. The defendants since have filed a motion to stay, citing the likely issuance of criminal charges and the possibility that Isroff may have to choose between defending himself in this case or invoking his Fifth Amendment rights and forgoing any defense. Dkt. No. 11. Because the balance of factors weighs against a stay at this time, the court will deny the motion without prejudice.

**I.    The Allegations in the Complaint (Dkt. No. 1)**

The twenty-page complaint alleges that on February 28, 2011, defendant Jeffrey Isroff, acting as the president of Shultz's Recycling Inc., entered into a Business Loan Agreement with Associated Bank. Dkt. No. 1 at ¶22. Under that

1

agreement, Isroff borrowed $850,000 from Associated Bank on March 2, 2011 and personally guaranteed Shultz's indebtedness. Id. at ¶¶22, 23.

Two years later, on September 30, 2013, Symax and members of UMS Holdings entered into an Operating Agreement that appointed Isroff as the initial manager and CEO of UMS Holdings. Id. at ¶9. The Operating Agreement gave Isroff the power to supervise, direct and control UMS Holdings' business and affairs. Id. at ¶10. UMS Holdings owned a complete interest in all UMS Entities and actively controlled the UMS Entities' business operations. Id. at ¶13. UMS Holdings officially hired Isroff as its CEO under an Employment Agreement on or about October 1, 2013. Id. at ¶14.

As CEO, Isroff had access to information regarding UMS Holdings' and UMS Entities' financial performance and inventory. Id. at ¶18. He acted as the primary liaison to lenders and was responsible for coordinating the borrowing relationship between UMS Holdings, UMS Entities and their lenders. Id. at ¶20. As early as 2014, Isroff allegedly began to participate in fraudulent conduct in which he manipulated internal and external documentation of inventory levels to convince lenders that the UMS Entities had sufficient inventory and assets to cause the UMS entities and their lenders to believe that the UMS Entities had enough inventory to collateralize UMS Holdings' and UMS Entities' "dramatically increased borrowings from Associated and BMO." Id. at ¶31. Isroff allegedly intentionally overstated UMS Entities' inventory to conceal losses incurred between 2014 and 2018. Id. at ¶32.

2

For example, on February 17, 2015, UMS Holdings and UMS Entities entered into a credit agreement with Associated Bank that allowed them access to a revolving line of credit through which they could borrow the lesser of either the maximum amount under the credit agreement or the amount of the "borrowing base," which consisted of, among other things, an amount equal to 85% of the appraised liquidation value of UMS Entities' eligible inventory. Id. at ¶25. On that day—February 17, 2015—and again on April 15, 2016, defendant Symax executed a subordinated promissory note and amendment with UMS Holdings, which indebted UMS Holdings to Symax for $377,944 and obligated UMS Holdings to pay Symax monthly interest payments to satisfy its outstanding debt to Symax. Id. at ¶37. Around June 3, 2016, Symax executed a subordination agreement with Associated Bank subordinating UMS Holdings' debt to Symax to UMS Holdings' debt to Associated. Id. at ¶38.

Isroff allegedly overstated the UMS Entities' inventory by tens of millions of dollars, causing the UMS Entities to overspend by tens of millions of dollars. Id. at ¶39. Meanwhile, UMS Holdings lost an estimated $6 million dollars in 2015, and by January 1, 2016, Isroff knew or should have known that UMS Holdings and the UMS Entities were insolvent. Id. at ¶¶34, 35. Between January 1, 2016 and January 1, 2019, Isroff allegedly caused UMS Holdings and the UMS Entities to increase the outstanding amounts under their lines of credit with Associated and BMO from $11.5 million to $35.4 million. Id. at ¶36. During roughly the same time frame, Isroff allegedly received over $1.5 million in salary payments not including bonuses, id. at ¶41; Symax received tens of

3

thousands of dollars in loan interest payments from UMS Holdings on account of subordinated debt provided to the UMS Entities by Symax, id. at ¶42; and UMS Holdings distributed over $200,000 to Symax to cover purported 2018 income tax liability, id. at ¶43.

Isroff abruptly resigned from his position as CEO of UMS Holdings on February 18, 2019, around the same time UMS Holdings and its lenders became concerned over operations and noncompliance with certain covenants. Id. at ¶46. The overstated inventory was discovered in early 2019 and caused UMS Holdings and the UMS Entities to be unable to meet their obligations to the lenders or continue operations; they had no choice but to file a receivership proceeding and liquidate their assets for the benefit of their creditors. Id. at ¶48. They filed a Chapter 128 receivership in Milwaukee County Circuit Court on November 5, 2019, and on November 15, 2019, the court appointed the plaintiff as receiver for UMS Holdings and the UMS Entities under Wis. Stat. §128.08. Id. at ¶1. The plaintiff filed the complaint in the Eastern District of Wisconsin on May 22, 2020. Id. at 2.

The plaintiff alleges eight claims for relief against Isroff and Symax: (1) fraudulent transfer in the form of employment compensation as to Isroff; (2) fraudulent transfer in the form of tax distributions as to Isroff and Symax; (3) fraudulent transfer in the form of loan interest payments as to Isroff and Symax; (4) breach of contract relating to the 2013 and 2018 employment contracts as to Isroff; (5) breach of contract relating to the operating agreement as to Isroff; (6) breach of fiduciary duty as to Isroff; (7) improper distributions

as to Symax; and (8) breach of contract relating to a business loan agreement as to Isroff and Symax. Id. at ¶¶50-127.

## II. Defendants' Motion to Stay (Dkt. No. 12)

The defendants answered the complaint on September 3, 2020. Dkt. No. 14. On the same day, they filed a motion asking the court to stay this federal civil suit "pending resolution of a parallel criminal proceeding." Dkt. No. 11. The defendants simultaneously filed the declaration of Attorney Steven Kravit, documenting his discussion with Assistant United States Attorney Adam Ptashkin. Dkt. No. 13. Ptashkin (who since has left the United States Attorney's Office for the Eastern District of Wisconsin) wrote a November 22, 2019 letter to Isroff that "[t]he United States has received information indicating that you [Isroff] have committed a felony." Dkt. No. 13 at ¶3. Kravit spoke with Ptashkin on November 26, 2019; Ptashkin described a criminal investigation into facts which matched the allegations in the civil complaint. Id. at ¶4. In that phone call, Ptashkin said that criminal charges against Isroff were likely but that the investigation was continuing. Id. at ¶5. In a conversation with Kravit on August 25, 2020, Ptashkin said that the "COVID 19 pandemic continues to make it difficult to predict timing," but reiterated that "Mr. Isroff is a target of [the U.S. Attorney's Office's] ongoing bank fraud investigation." Id. at ¶7.

Based on the ongoing criminal investigation, the defendants asked the court to stay the civil proceedings. Dkt. No. 11. The defendants discussed seven factors: (1) whether both cases involve the same subject matter; (2) the burden that any particular aspect of the proceedings may impose on the

5

defendants; (3) the convenience of the court in the management of its docket, and the efficient use of judicial resources; (4) the posture of the criminal proceedings; (5) the effect on the public interests at stake if a stay were to be issued; (6) whether both cases are brought by the government; and (7) the interest of the plaintiffs in proceeding expeditiously with this litigation and the potential prejudice to plaintiffs of delay. Dkt. No. 12 at 4 (citing Keating v. Office of Thrift Supervision, 45 F.3d 322, 324-25 (9th Cir. 1995); Harper v. City of Kenosha, No. 09-CV-88, 2010 WL 446043, at *2 (E.D. Wis. Feb. 2, 2010)); SEC v. LaGuardia, 435 F.Supp.3d 616, 621(S.D.N.Y. 2020)).

The defendants argued that the potential criminal investigation and this civil case involve the "exact same facts." Id. at 5. They asserted that the overlap in facts would "impose a substantial burden on Isroff, who will have to choose between asserting [his] Fifth Amendment rights and waiving those rights in order to defend this case." Id. Isroff argued that he would face a real threat of self-incrimination every time he answered discovery or responded to dispositive motions. Id. at 5-6. The defendants argued that the lack of indictment did not alter the analysis, id. at 6, and opined that the delay in wrapping up the criminal investigation was predominantly or solely the result of the pandemic, id. at 7.

The defendants also argued that judicial efficiency weighed in favor of a stay. Id. They asserted that if the court did not issue a stay, it would be burdened with "countless assertions of Isroff's Fifth Amendment privilege." Id. at 8. They asserted that a stay would help preserve Isroff's resources, which

6

could benefit the plaintiff in the event the plaintiff ended up entitled to restitution. Id.

Finally, the defendants argued that no other compelling factors weighed against granting a stay. Id. at 9. They asserted that the fact that the government is not also a party to this civil case does not militate against a stay. Id. at 9. They argued that the public had no interest in the outcome of the civil case because the case does not "involve a tangible threat of immediate and serious harm to the public at large," does not involve a securities law violation that poses a continuing risk to the investing public and does not pose a risk that the public will be exposed to a dangerous product. Id. (citations omitted). Finally, the defendants argued that the plaintiff would not be prejudiced by any delay because the criminal case would ensure preservation of evidence, and if a criminal prosecution results, the criminal case could resolve open issues in the civil case. Id. at 10.

### III. Plaintiff's Brief in Opposition (Dkt. No. 17)

On September 24, 2020, the plaintiff filed her brief in opposition and a declaration from Attorney David Sisson (one of the attorneys representing the plaintiff). Dkt. Nos. 17, 17-1. Attorney Sisson averred that he had contacted Attorney Kravit around January 2020 to ask whether Kravit would accept service on Isroff's behalf or reveal his location. Dkt. No. 17-1 at ¶2. Kravit indicated that Isroff had declined to give him authority to comply with either request, but Kravit stated that he believed that Isroff had left the United States for France. Id. Sisson averred that he had made several requests of Kravit to

accept service, all of which had been met with the same response. Id. at ¶3. He averred that his firm had spent significant time and resources trying to serve the defendants—including commissioning a digital forensic analysis of Isroff's work computer, hiring a French private investigator to locate Isroff in France and hiring French counsel to try to effectuate service—resulting in over $10,000 in legal fees and expenses. Id.

The plaintiff argued that a stay is an exception to the rule, should be issued only when the interests of justice require it and should only be granted after a balancing of the interests of the plaintiff, the defendants and the public. Dkt No. 17 at 3-4. The plaintiff identified six factors articulated by a court in this district (rather than the seven factors articulated by the Ninth Circuit and cited by the defendants). Id. at 4. The six factors include:

> (1) whether the civil and criminal matters involve the same subject; (2) whether the governmental entity that has initiated the criminal case or investigation is also a party in the civil case; (3) the posture of the criminal proceeding; (4) the effect of granting or denying a stay on the public interest; (5) the interest of the civil-case plaintiff in proceeding expeditiously; and (6) the potential prejudice the plaintiff may suffer from a delay; and the burden that any particular aspect of the civil case may impose on defendants if a stay is denied.

Id. (citing Harper v. City of Kenosha, No. 09-cv-88, 2010 WL 446043, at *2 (E.D. Wis. Feb. 2, 2010)).

The plaintiff argued that, without an indictment, it is impossible know whether the cases involve the same subject matter. Id. at 5. She asserted that the government is not a party to the civil suit and that the plaintiff was not coordinating her efforts with the government's criminal litigation strategy. Id.

She argued that a stay is disfavored when the criminal case has not commenced, and that before the filing of criminal charges, the potential burden on a defendant's Fifth Amendment right is speculative. Id. at 5-6. She argued that denying the stay would serve the public's interest in a prompt disposition and the resolution of an existing case. Id. at 6. She asserted that she had a strong interest in proceeding expeditiously as a delay would be unfairly prejudicial to her ability to recover assets for creditors. Id. at 6-7. She argued that the defendant had not amply explained why he could not "selectively invoke[e] his Fifth Amendment right . . . as necessary," and noted that Symax has no Fifth Amendment rights and that Isroff would not have a Fifth Amendment right as the records custodian for Symax. Id. at 7.

**IV.  Defendants' Reply (Dkt. No. 19)**

On October 8, 2020, the defendants filed a reply brief, along with a second declaration by Attorney Kravit and numerous sealed exhibits. Dkt. Nos. 19, 20, 20-1, 20-2, 20-3, 20-4. The declaration explained the conversation that Kravit had with Sisson regarding service. No. 20 at 1-2. The sealed exhibits explained how the defendants know the civil and criminal cases will overlap. Dkt. No. 20-4 through 20-7.

The defendants argue that the absence of the government as a party to the civil case should not weigh against a stay; "[t]he close relationship between Plaintiff here and the government's criminal investigation creates a concerning risk of cross-pollination between the civil and criminal proceedings," noting that the plaintiff is the receiver for UMS in a state workout and was appointed

9

at the request of, and with the approval of, the two alleged bank victims. Dkt. No. 19 at 6-7. To that end, the defendants included *in camera, ex parte* submissions to show that the government is basing its investigation on documents obtained by issuing grand jury subpoenas to the banks. Id.; Dkt. Nos. 20-1, 20-2, 20-3, 20-4.

The defendants took issue with the plaintiff's view that the likelihood of criminal charges is "speculative;" they argued that the government had been engaged in an active investigation since November 2019—advising Isroff that he was a target, serving grand jury subpoenas, executing search warrants, having a "taint team" review documents and sharing criminal discovery with criminal defense counsel. Dkt. No. 19 at 7. They asserted that the investigation was in its "later stages" and that a charging decision was imminent. Id. at 8. The defendants suggested that the court grant the say and review it periodically. Id.

The defendants asserted that there was little public interest in this case beyond the generalized interest that exists in all cases. Id. Finally, the defendants maintained that the plaintiff had not shown valid interest that weighed against a stay. Id. The defendants rejected the suggestion that the plaintiff could proceed against Symax if the case was stayed as to Isroff, stating that Symax could not defend itself without Isroff's testimony. Id. at 10.

V.     **Subsequent Developments (Dkt. Nos. 22, 23)**

As the above account indicates, the parties completed briefing on the motion in October 2020—almost a year ago. The court did not act promptly on the motion. Consequently, the civil litigation has been informally stayed for

eleven months. On September 7, 2021, Attorney Sisson—writing on behalf of the plaintiff—wrote to urge the court to promptly resolve the motion. Dkt. No. 22. He explained that on February 16, 2021, another plaintiff had filed suit in Indiana state court against Isroff, Symax and Elizabeth Isroff; it appeared that the defendants had not yet answered. Id. at 1. Attorney Sisson stated that while it was not clear how the Indiana litigation would proceed, he was concerned that if the Indiana plaintiff's obtained a judgment, it "would likely impact [the plaintiff's] ability to collect any judgment entered against the same parties in this case." Id. at 1-2. While generously acknowledging the impact of the COVID-19 pandemic on the court system, counsel asked the court to decide the motion for stay as quickly as possible. Id. at 2.

The same day, the court received a responding letter from Attorney Kravit. Dkt. No. 23. Attorney Kravit represented that "nothing has changed." Id. at 1. He indicated that the government continued to investigate Mr. Isroff. Id. He also stated that Isroff was not defending the suit in Indiana because "he has insufficient funds to defend, much less pay back the simple Note that underlies that lawsuit." Id. Kravit averred that the Indiana suit was a debt collection action, unrelated to the fraud allegations in the instant case. Id. Attorney Kravit concluded by stating,

> We have no control over how, whether, or when Mr. Isroff will face criminal charges. The Receiver Ms. DeMarb, having chosen to pursue Mr. Isroff criminally, must face the consequences of that choice. If Mr. Isroff was able to defend this case, he would, because it is defensible.

Id. at 2.

11

Case 2:20-cv-00778-PP   Filed 09/17/21   Page 11 of 16   Document 24

## VI. Analysis

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes with economy of time and effort for itself, for counsel, and for litigants." Landis v. North American Co., 288 U.S. 248, 254 (1936). The Seventh Circuit has held that a civil case can be stayed under "special circumstances," to avoid "substantial and irreparable prejudice." United States v. Certain Real Property, Commonly Known as 6250 Ledge Rd., Egg Harbor, Wis., 943 F.2d 721, 729 (7th Cir. 1991) (citing United States v. Little Al, 712 F.2d 133, 136 (5th Cir. 1983). However, "a blanket assertion of the privilege [] does not provide a sufficient basis for the district court to grant a stay." Id.

District courts in the Seventh Circuit have applied a six-factor test that balances (1) whether the cases involved the same subject matter, (2) whether the cases were both brought by the government, (3) the procedural posture of the criminal case, (4) the effect of a stay on public interests, (5) the interests of the plaintiffs in proceeding expeditiously with the litigation and potential prejudice to the plaintiff if a stay was granted, (6) and the burden that any particular aspect of the civil case may impose on defendants if the stay is denied. Harper, 2010 WL 446043, at *2; see also Bailey v. Weinandt, No. 17-cv-943-bbc, 2018 WL 1660731, at *1 (W.D. Wis. Apr. 5, 2018); Estate of Swayzer v. Armor Corr. Health Services, Inc., No. 16-CV-1703, 2018 WL 1535953, *2 (E.D. Wis. Mar. 29, 2018).

1.   *Same Subject Matter*

Attorney Kravit's declaration and accompanying documents provide a basis to believe that the subject matter of the civil and criminal investigations is the same or very similar. Dkt. Nos. 20, 20-1 through 20-4. The plaintiff is correct that it is impossible to tell with certainty if they are the same without an indictment, but the documents the defendants have provided suggest a strong likelihood that there is substantial overlap. The allegations in the civil case are broad, and the allegations of fraud presumably relate to or are a part of the criminal investigation. This factor supports the issuance of a stay.

2.   *Government Involvement*

The parties have provided conflicting information on this factor. The plaintiff asserts that she is not coordinating her efforts with the government's criminal litigation. Dkt. No. 17 at 5. The defense responds that there must be some cooperation—the plaintiff/receiver was appointed at the request of and with the approval of the alleged bank victims, and the defendants assert that the plaintiff and the two alleged bank victims are the complainants in the criminal investigation and that the government is basing at least some of the criminal investigation on documents subpoenaed from those parties. Dkt. No. 19 at 7. The conflicting information means that this factor does not weigh for or against a stay.

3.   *Posture of the Criminal Proceedings*

As of the parties' September 7, 2021 correspondence with the court, the government had not obtained an indictment or filed a complaint. A search of

13

this court's electronic docket shows that as of September 16, 2021, the only federal case involving defendant Isroff is this one. The defendant argues that the lack of an indictment should not prevent a stay, citing Doe v. Slipper, 869 F. Supp. 2d 113, 116 (D. D.C. 2012). But the court in Slipper granted a stay after the defendant had been arrested but before the indictment was returned. There is no indication in this case that Isroff has been arrested, and the court has no information indicating that the case has progressed beyond the investigatory stage. "[B]ecause the charges may never be filed, the duration of the stay would be indefinite." CMB Export, LLC and CMB Summit, LLC v. Atteberry, No. 4:13-cv-04051-SLD-JEH, 2014 WL 4099721, at *4 (C.D. Ill. Aug. 20, 2014). Without knowing if or when the government will move ahead with criminal charges, this factor weighs against a stay. See Chagolla v. City of Chi., 529 F. Supp. 2d 941, 946 (N.D. Ill. 2008) ("A stay is disfavored where defendants are under the mere threat of criminal charges.").

        4.     *Interests of the Public*

The plaintiff argues that the public has an interest in speedy resolution of civil litigation, and that a stay will thwart this interest. Dkt. No. 17 at 6. The defendant argues that the public has little interest in this case and that the plaintiff's argument amounts to this factor always weighing against the issuance of a stay. Dkt. No. 12 at 11; Dkt. No. 19 at 8-9. The complaint alleges that the defendants committed significant acts of fraud. In great part due to the court's delay, those allegations have been pending for fourteen months with no progress beyond the defendants' answer. It is in the public interest to

effectuate the speedy resolution of a fraud case, which involves more than what the defendants have characterized as the mere collection of money. Dkt. No. 19 at 8. A fraud case implies knowing and deliberate misconduct, issues of interest to the public. This factor weighs against a stay.

> 5. *Interests in Resolving Case Expeditiously and Potential Prejudice to the Plaintiff if Stay is Granted*

The plaintiff's argument that she has spent significant time and resources trying to serve Isroff are not particularly relevant to the question of expeditious resolution of the case or potential prejudice to the plaintiff. More compelling is the plaintiff's argument that as time passes, more suits may be filed (the Indiana suit being one example), assets may be liquidated or dissipated and the funds available to creditors may shrink—the dreaded "melting ice cube" in insolvency cases. This factor weighs against a stay.

> 6. *Interests of the Defendants*

The sixth factor weighs the burden that denying a stay could or would impose on a defendant. The defendants argue that the plaintiff's interests in expeditious resolution of the civil case are outweighed by Isroff's Fifth Amendment privilege against self-incrimination. Dkt. No. 19 at 9. The court concedes the possibility that Isroff may be forced to assert his Fifth Amendment rights in response to discovery demands. The parties may find themselves in disagreement regarding whether Isroff has a Fifth Amendment right as to some issues. But the resolution to that problem is not to issue what could end up being an indefinite stay. If this civil litigation becomes mired in disputes about the scope of Isroff's Fifth Amendment privilege, or if it appears

15

that valid invocation of that privilege has brought the litigation to a standstill, the defendants may renew their motion for a stay.

The court realizes this is not a perfect solution, and that it may be kicking the can down the road. Nor is the court ignoring the defendants' suggestion that the court could impose a stay but review it periodically. That is not a perfect solution, either; all the parties and the court would be burdened by the need to conduct such reviews for an indeterminate period.

Ultimately, three of the factors weigh against a stay. The criminal investigation has been proceeding since at least November 2019. Although the grand jury briefly stopped meeting at the beginning of the pandemic, it has been meeting regularly for well over a year. While Attorney Ptashkin's departure from the U.S. Attorney's Office likely slowed the investigation, there are plenty of other AUSAs to pick up where he left off. A criminal prosecution is a possibility; this civil litigation is a reality. The court will deny the motion for the stay without prejudice.

## VII. Conclusion

The court **DENIES WITHOUT PREJUDICE** the defendants' motion to stay. Dkt. No. 11.

Dated in Milwaukee, Wisconsin this 17th day of September, 2021.

**BY THE COURT:**

_____

**HON. PAMELA PEPPER**
**Chief United States District Judge**